**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| TEAMSTERS LOCAL 346 HEALTH FUND, on its own behalf and on behalf of all others similarly situated, | : : : : | |
| | : | **Case No._____-Civ** |
| Plaintiff, | : : | |
| v. | : : | |
| SCHERING-PLOUGH CORPORATION, SCHERING CORPORATION, and SCHERING SALES CORPORATION | : : : : | |
| Defendants. | : : | |

## CIVIL CLASS ACTION COMPLAINT

This action is brought by the Plaintiff, Teamsters Local 346 Health Fund, on behalf of itself and a nationwide class (hereinafter the "Class") of similarly situated entities and individuals who made payments based on the Defendants' illegal off-label marketing of certain drugs specified below from January 1, 1995 through June 2005. Plaintiff alleges damages resulting from payments it made for drugs illegally marketed by Defendants. Plaintiff would not have purchased or paid any of the purchase price of the drugs at issue if it had been aware of the Defendants' illegal marketing of these drugs as detailed further below.

### I.    NATURE OF THE CASE

1.    Plaintiff brings this action to recover drug payments made as a result of Defendants' fraudulent scheme and conspiracy involving the illegal marketing, promotion and sale of the following prescription drugs: Intron® A ("Intron A"), Temodar® ("Temodar"), PEG-Intron® ("PEG-Intron"), Rebetol® ("Rebetol"), Eulexin® ("Eulexin"), Integrilin® ("Integrilin"), and Fareston® ("Fareston") (hereinafter the "Subject Drugs"). In addition to each of these drugs being sold individually, some of these drugs were also sold in combination with one another such

as in drug therapy known as Rebetron Combination Therapy or Rebetol/Intron A Combination Therapy (hereinafter "Rebetron Combination Therapy") and PEG-Intron Combination Therapy or Rebetol/PEG-Intron Combination Therapy (hereinafter "PEG-Intron Combination Therapy").[1]

2.      Among other things, as described more fully in this Complaint, Defendants engaged in the following general types of acts and omissions as part of their illegal marketing, promotion and sales scheme and conspiracy: (1) they promoted certain of the Subject Drugs to physicians by offering and paying various types of improper bribes, kickbacks and other illegal remuneration, whether or not such Subject Drugs were promoted, prescribed and used for indicated/approved medical conditions and in doses and/or for durations that were indicated/approved; (2) they promoted certain of the Subject Drugs at doses and/or for durations of use that were not medically safe, efficacious, effective, or useful, whether or not such Subject Drugs were promoted, prescribed, and used for an indicated/approved medical condition; and (3) they promoted certain of the Subject Drugs for non-indicated/unapproved or "off-label" uses.

3.      More specifically, among other things, this Complaint details numerous kickbacks provided by Defendants to physicians and other medical providers to induce them to prescribe certain pharmaceutical products.  Defendants' practices were part of a highly organized and orchestrated campaign, which, among other things, included: (1) offering kickbacks to physicians and healthcare providers in the form of samples; (2) offering kickbacks to physicians in the form of  "overfilled vials"; (3) offering kickbacks to physicians and healthcare providers in the form of clinical drug trials; (4) providing lavish entertainment to physicians and healthcare

---

[1] The term "combination therapy" shall hereinafter refer to either Rebetron Combination Therapy or PEG-Intron Combination Therapy, or both; the term "Subject Drugs" shall hereinafter collectively refer to all of the drugs identified above – *i.e.* Intron A, Temodar, PEG-Intron, Rebetol, Eulexin, Integrilin, and Fareston – together with the combination therapy described above – *i.e.* Rebetron Combination Therapy and/or PEG-Intron Combination Therapy.

providers; (5) providing physicians and healthcare providers with sham speaker fees a/k/a "honorariums"; (6) providing physicians and healthcare providers with sham grants; (7) providing physicians and healthcare providers with sham preceptorships; (8) using "investigator meetings" as inducements; (9) using "advisory board meetings" as inducements; (10) creating sham paperwork programs as a means to provide kickbacks to physicians; (11) providing remuneration as inducements to physicians and healthcare providers through the Commitment to Care program; (12) providing remuneration to a select handful of physicians through the Consultant Care Network; and (13) providing free full-time Physician Assistants to physician practices.  In addition, this Complaint alleges violations of the federal False Claims Act, among other violations of law, by Defendants in actively promoting certain products for "off-label" uses and for which Plaintiff and/or members of the Classes were, by way of Defendants' illegal scheme and conspiracy, caused to make payments.

4.    The fraudulent marketing, promotion and sales scheme and conspiracy, as described herein, caused Plaintiff and members of the Class to collectively pay hundreds of millions of dollars for the Subject Drugs.  As discussed herein, Defendants have pled guilty to core aspects of the fraudulent marketing, promotion, and sales scheme and conspiracy and have otherwise admitted certain facts pertaining thereto as part of their criminal plea and settlement, although it appears that they have not disclosed the full breath of their criminal conduct.

## II.    **PARTIES**

5.    Plaintiff Teamsters Local 346 Health Fund, is headquartered and has its principal place of business at 5912 Waseca Avenue, Duluth, MN 55806.  Teamsters Local 346 Health Fund is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1002(1) & (3).  As such

3

Teamsters Local 346 Health Fund is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). Plaintiff is a not-for-profit trust jointly sponsored by Teamsters Local 346 and participating employers and administered by a Board of Trustees established and maintained to provide comprehensive health care benefits to participant-workers and retirees, who are or were employed under various collective bargaining agreements, and to their dependents. Throughout the relevant time period, Teamsters Local 346 Health Fund paid for Subject Drugs sold by Defendants by means of their illegal marketing scheme and conspiracy. When Plaintiff Teamsters Local 346 Health Fund made payments for Subject Drugs it was unaware of Defendants' marketing scheme and conspiracy.

6.      Defendant Schering-Plough Corporation ("Schering-Plough") is a New Jersey corporation with its principal place of business (referred to by Schering-Plough as its World Headquarters) at 2000 Galloping Hill Road, Kenilworth, New Jersey. Schering-Plough is a global company principally engaged in the manufacture and sale of prescription pharmaceuticals throughout the United States. At all times relevant hereto, Schering-Plough engaged or assisted in the manufacture, distribution, sale, promotion, and/or marketing of numerous prescription pharmaceuticals. Upon information and belief, Schering-Plough, at all times relevant hereto, also directed, engaged or assisted in the illegal conduct with respect to the Subject Drugs that is the subject of this Complaint.

7.      Defendant Schering Corporation is a New Jersey corporation with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey. Schering Corp. is a wholly-owned subsidiary of Schering-Plough. Upon information and belief, Schering Corp., at all times relevant hereto, assisted in directing, engaged or otherwise assisted in the manufacture, distribution, sale, promotion, and/or marketing of Schering-Plough's prescription

4

pharmaceuticals, and specifically in the illegal conduct with respect to the Subject Drugs that is the subject of this Complaint.

8. Defendant Schering Sales Corporation is a Delaware corporation with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey. Schering Sales is a wholly-owned subsidiary of Schering-Plough and/or Schering Corp. A Schering-Plough senior vice president of global compliance and business practices was quoted in media reports regarding the criminal plea agreement with the federal government as stating that Schering Sales "is an entity whose sole purpose is to plead guilty in these matters." Despite the meaning of such a statement if interpreted literally, it is believed, and therefore averred, that Schering Sales, at all times relevant hereto, assisted in directing, engaged or otherwise assisted in the manufacture, distribution, sale, promotion, and/or marketing of Schering-Plough's prescription pharmaceuticals, and specifically in the illegal conduct with respect to the Subject Drugs that is the subject of this Complaint.

9. The acts alleged in this Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

10. Various persons and/or firms, not named as defendants herein, including various medical providers located throughout Massachusetts and the country, have participated as co-conspirators in the violations alleged herein and have performed acts and made statements or omissions in furtherance thereof.

### III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and

5

1332(d), because the matter in controversy exceeds $5 million, exclusive of interest and costs, and because more than two-thirds of the members of the putative Class are citizens of states different from that of the Defendants.

12.     This claim has been filed in this District because a substantial part of the events or omissions giving rise to the claims in this action occurred in this Judicial District, and Defendants may be found within this Judicial District.  Venue is proper in this jurisdiction under 28 U.S.C. § 1391.  Indeed, Douglas Hay, Jay Stafford, and Tracy Stein, three former Schering sales representatives who have personal knowledge of the allegations herein, filed a civil *qui tam* action against Schering on behalf of the federal government in this District and consented thereby to the jurisdiction of this District.  *See United States of America ex rel. Douglas Hay, Jay Stafford and Tracy Stein v. Schering Plough Corp.*, No. 01-11923-MLW (D.Mass).  Moreover, the Department of Justice brought its criminal action against Defendants in this District.  *See United States of America v. Schering Sales Corporation*, No. 06-CR-10250 (D.Mass).

13.     As a result of the distribution and sale of their products to consumers in the state of Massachusetts, directly or through their subsidiaries, affiliates or agents, Defendants obtained the benefits of the laws of Massachusetts and the Massachusetts market for their products. Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) have, upon information and belief:

a. transacted business in Massachusetts;

b. contracted to supply or obtain services or goods in Massachusetts;

c. intentionally availed themselves of the benefits of doing business in Massachusetts;

d. produced, promoted, sold, marketed, and/or distributed the Subject Drugs in Massachusetts and, thereby, have purposefully profited from their access to markets in Massachusetts;

e. caused tortious damage by act and omission in Massachusetts;

6

f. caused tortuous damage in Massachusetts by acts and omissions committed outside such jurisdiction while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction; and

g. committed acts and omissions which Defendants knew or should have known would cause damages (and, in fact, did cause damage) in Massachusetts to members of the Class while (i) regularly doing or soliciting buseinss in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods uses or consumed or services rendered in such jurisdiction.

14.    Defendants implemented their fraudulent marketing scheme in this District, as well as nationwide, through health care providers, sales and other representatives, agents, and others who reside and/or transact business in this District.  Defendants' scheme, as alleged herein, thereby affected members of the Class who reside or transact business throughout the United States, including within this District.  Accordingly, Defendants have submitted themselves to the jurisdiction of this Court by committing illegal acts within this State and this judicial District specifically.

## IV.    FACTUAL ALLEGATIONS

**A.    The Drugs**.

### i.    Intron A

15.    Defendants, at all times relevant hereto, manufactured, distributed, promoted, marketed and/or sold Intron A, a brand name prescription drug generically known as interferon alfa-2b, recombinant.

16.    In or about 1983, Defendants filed with the FDA a New Drug Application ("NDA") seeking approval of Intron A as a "new drug" within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5).  (A broader discussion of the relevant regulatory process including the role of the FDA, legal obligations and prohibitions under the FDCA, and

requirements pertaining to NDAs – is provided below at sub-section B). In or about 1986, the FDA approved Intron A for the treatment of various conditions, including, but not limited to, chronic hepatitis B, chronic hepatitis C, AIDS-related Kaposi's sarcoma, hairy cell leukemia, malignant melanoma and follicular (non-Hodgkin's) lymphoma. Schering-Plough (at www.introna.com) has identified each of these conditions, and the condition of condylomata acuminata (genital warts) as conditions for which Intron A is indicated. Superficial bladder cancer is not listed on this site by Schering-Plough as a condition for which Intron A is indicated. Upon information and belief, at no time relevant hereto did the FDA approve Intron A for use in treatment of superficial bladder cancer.

17. Intron A has been prescribed "off-label" (see below for discussion of restrictions on promotion of "off-label" uses of prescription drugs at sub-section B) for the purpose of treating superficial bladder cancer, among other diseases. Upon information and belief, Defendants heavily marketed Intron A to urologists for such off-label purposes over the time period relevant to this action.

18. Superficial bladder cancer is restricted to the bladder lining or mucosa. It includes both papillary tumors and carcinoma in situ. In contrast, invasive cancer is defined as extending through the mucosa into the muscle. At all relevant times hereto, the industry standard and most active modality for treatment of superficial bladder cancer (*i.e.* the treatment of carcinoma in situ in the absence of associated invasive cancer of the bladder) was Bacillus Calmette-Guerin ("BCG"), which was first used to treat bladder cancer in 1976. BCG was not sold by Defendants over the relevant time period.

19. Defendants' Sales Representatives marketed Intron A for superficial bladder cancer in at least three different ways, depending on the time period:

(a)    Up until 1999, Defendants' Sales Representatives attempted to cause physicians to prescribe Intron A alone (when BCG failed), without combining it with BCG;

(b)    Beginning in the mid to late 1990s, Defendants funded studies which, according to their paid physicians/study authors, suggested that Intron A is synergistically beneficial for bladder cancer patients when combined with BCG. As a result, and beginning in 1999, Defendants' Sales Representatives pitched Intron A to be used in conjunction with BCG (as opposed to alone) when BCG initially failed; and

(c)    In or after 2000, Sales Representatives pushed physicians to prescribe Intron A for patients who had not yet failed, called "naïve" patients.

20.    Defendants, by and through the Oncology/Biotech Sales Management, Product Management, and Marketing Management Departments, instructed Sales Representatives to promote and market Intron A for other off-label uses, such as renal cell carcinoma, chronic myelogenous leukemia, myeloma, metastatic melanoma, and perones disease.

21.    Intron A is generally marketed to, and prescribed by physicians who specialize in urology, oncology, and gastroenterology.

22.    Schering-Plough's 2004 and 2005 Annual Reports indicate that net sales of Intron A in 2002, 2003, 2004, and 2005 were $533 million, $409 million, $318 million, and $287 million, respectively.  Its 2001 through 2003 Annual Reports do not provide net sales figures limited to Intron A, but these reports provide net sales figures for the Defendants' "Intron franchise," consisting of Intron A (as monotherapy), PEG-Intron (as monotherapy), Rebetron Combination Therapy (*i.e.*, Intron A in combination with Rebetol) and PEG-Intron Combination

9

Therapy (*i.e.*, PEG-Intron in combination with Rebetol). All told, net sales for the Intron franchise in years 2001, 2002, and 2003 totaled $1.4 billion, $2.7 billion, and $1.9 billion, respectively. In year 2000, net sales of Intron A and Rebetron Combination Therapy totaled $1.4 billion.

### ii.    Temodar

23.    Defendants, at certain times within the period relevant hereto, manufactured, distributed, promoted, marketed and/or sold Temodar, a brand name prescription drug generically known as temozolomide.

24.    In or about 1998, Defendants submitted an NDA for approval of Temodar for use in treatment of three forms of cancer: (a) refractory analplastic astrocytoma (a type of brain tumor that was unresponsive to a first-line drug regimen of nitrosourea and procarbazine), (b) recurrent glioblastoma multiforme (another type of brain tumor that was unresponsive to first-line therapy), and (c) metastatic malignant melanoma (melanoma that has metastasized to the brain). Temodar was a "new drug" within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5). The FDA considered Temodar under its accelerated approval procedures for new drugs for serious or life threatening illnesses. *See* 21 C.F.R. § 314.510.

25.    In or about August 1999, the FDA approved Temodar for the treatment of refractory anaplastic astrocytoma, a disease suffered by about 4,000 patients per year. According to Schering-Plough, Temodar "received full approval for the treatment of adult patients" with that disease, in the first quarter of 2005. Additionally, according to the 2005 Annual Report, it also was not until the first quarter of 2005 that Schering-Plough "[g]ained U.S. approval for Temodar . . . for use in combination with radiotherapy for the treatment of adult patients with newly diagnosed glioblastoma multiforme." Thus, as stated in the Criminal Information, and at

10

all times relevant hereto, the FDA had not approved Temodar for use in treatment of newly diagnosed anaplastic astrocytomas, glioblastoma multiformes, metastatic melanoma, or brain metastases of other solid tumors.

26.    Upon information and belief, over the time period relevant to this action in which Temodar was indicated only for refractory anaplastic astrocytoma, that specific condition accounted for only a small percentage (perhaps 5% to 15%) of Temodar sales.

27.    Defendants' marketing plans and sales goals, however, included promotion and marketing of Temodar in the following off-label markets: newly diagnosed anaplastic astrocytoma (AA), newly diagnosed glioblastoma multiform (GBM), refractory glioblastoma multiform (GBM), meningomas, oligodendrogliomas, brain metastasis from primary tumors (colon, melanoma, breast, and lung cancer), malignant melanoma, extended therapy usage, combination therapy usage with radiation, combination therapy usuage with various other chemotherapy agents, and all other known brain tumor types.  Beetween 85%-95% of Temodar sales have been derived from off-label uses.

28.    Temodar is generally marketed to, and prescribed by physicians who specialize in medical oncology and neuro-oncology.

29.    Schering-Plough has identified Temodar as being indicated for "treatment of adult patients with newly diagnosed glioblastoma multiform concomitantly with radiotherapy and then as maintenance treatment."  Schering-Plough further stated that Temodar was indicated for "treatment of adult patients with refractory anaplastic astrocytoma."  Schering-Plough's 2004 and 2005 Annual Reports indicated that net sales of Temodar in 2002, 2003, 2004, and 2005 were $278 million, $324 million, $459 million, and $588 million, respectively.  According to its 2000 and 2001 Annual Reports, its net sales of Temodar for those years were $121 million and

11

$180 million, respectively.

### iii.    PEG-Intron

30.    Defendants, at certain times during the relevant time period, manufactured, distributed, promoted, marketed and/or sold PEG-Intron, a brand name prescription drug generically known as peginterferon alfa-2b.

31.    Schering-Plough stated on its web site that PEG-Intron "is indicated for use alone or in combination with [Rebetol] for the treatment of chronic hepatitis C in patients with compensated liver disease who have not been previously treated with interferon alpha and are at least 18 years of age."   Schering-Plough's 2001 Annual Report stated that PEG-Intron, as monotherapy for hepatitis C, was approved in the United States in January 2001, and that Rebetol was approved in the United States as a separately marketed product in July 2001.  It further stated, that PEG-Intron for use in combination with Rebetol, *i.e.* PEG-Intron Combination Therapy, was approved in the United States in August 2001.

32.    Schering-Plough's 2005 and 2004 Annual Reports indicated that net sales of PEG-Intron in 2002, 2003, 2004, and 2005 were $1.015 billion, $802 million, $563 million, and $751 million, respectively.  Its 2001 through 2003 Annual Reports do not provide net sales figures limited to PEG-Intron, but these reports provide net sales figures for the Defendants' "Intron franchise," consisting of Intron A (as monotherapy), PEG-Intron (as monotherapy), Rebetron Combination Therapy, and PEG-Intron Combination Therapy.  All told, net sales for the Intron franchise in years 2001, 2002, and 2003 totaled $1.4 billion, $2.7 billion, and $1.9 billion, respectively.

### iv.    Eulexin

33.    Defendants, at certain or all times relevant hereto, manufactured, distributed,

promoted, marketed and/or sold Eulexin, a brand name prescription drug generically known as flutamide.

34.    Upon information and belief, Eulexin capsules (containing 125 mg of flutamide) received FDA approval in the early or mid 1990s.  It is indicated for use in combination with LHRH agonists for the management of locally contained Stage B2-C and Stage D2 metastic carcinoma of the prostate.

### v.    Integrilin

35.    Defendants, since at least 1998, have manufactured, distributed, promoted, marketed and/or sold Integrilin, a brand name prescription drug generically known as eptifibatide.  Defendants, at times during the relevant period, co-promoted Integrilin with others, including COR-Therapeutics, Inc., Genentech, Inc. and Millennium Pharmaceuticals, Inc.

36.    Integrilin injection, approved by the FDA in 1998, is indicated for treatment of patients with acute coronary syndrome (unstable angina and non-Q-wave MI), including patients who are to be managed medically and those undergoing percutaneous coronary intervention ("PCI").  Integrilin is also indicated for use at time of PCIs, including procedures involving intracoronary stenting.  Integrilin is generally administered in the hospital setting only, and is generally classified as a "platelet aggregation inhibitor."

### vi.    Fareston

37.    Defendants, at certain or all times since in or about 1997, have manufactured, distributed, promoted, marketed and/or sold Fareston, a brand name prescription drug generically known as toremifene citrate.

38.    Fareston tablets for oral administration, approved by the FDA in 1997, are indicated for treatment of metastatic breast cancer in postmenopausal women with estrogen-

13

receptor positive or unknown tumors.

**B.    The Role of the FDA and the FDCA: Regulation of Marketing Practices and Restrictions on Promotion of "Off-Label" Uses of Prescription Drugs.**

39.    The FDA is, and at all time relevant hereto was, responsible for evaluating the safety and effectiveness of any new drug for human use at specified dosages before distribution into interstate commerce.  21 U.S.C. § 355.  Pursuant to federal law, a "new drug" (subject to certain exceptions not relevant here) is any drug not generally recognized by qualified experts as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling.  21 U.S.C. § 321(p).

40.    The FDCA and its implementing regulations govern, and at all times relevant hereto governed, the lawful interstate distribution of drugs for human use.  21 U.S.C. § 301 *et seq*.  Before a sponsor may legally distribute a new drug, the sponsor must submit and NDA for the drug to the FDA for its prior approval.  21 U.S.C. § 355(a).

41.    As part of an NDA, a drug manufacturer is required by the FDCA to submit to the FDA proposed labeling for the intended uses of the drug and to specify the conditions for therapeutic use.  21 U.S.C. § 355(b).  The FDCA also requires a sponsor to provide to the FDA appropriate data generated in randomized and well-controlled clinical trials demonstrating that the drug is safe and effective when used in accordance with the proposed labeling.

42.    The FDCA prohibits introducing into interstate commerce any new drug, unless an NDA has been approved.  A sponsor is permitted by law to promote and market a drug only after the FDA reviews the NDA.  And such permission to promote and market the drug is only for the medical conditions of use and in the other manners specified in the approved labeling.  Any use of a drug that is not approved by the FDA, and that is not included in the drug's approved labeling, is an "unapproved use" or "off-label use."  21 U.S.C. § 355.

43.     The FDCA and its regulations mandate that any information provided by a pharmaceutical company about its products, regardless of whether on or off-label or directed to a physician or a consumer, must be fair and balanced.  This requirement pertains not only to written material, but also to any other presentations of information.  This means that the information must accurately and fairly present all data relevant to any drug information provided. Thus, a company must provide full disclosure regarding its products and must provide both positive and negative information that the company knows about its products.  A company may not select and provide only that information which is beneficial to the company or information that represents only part of the truth regarding its drugs.  The Defendants knew this to be the case and, despite their pervasive actionable conduct in this case, at times even trained their employees to be aware of these requirements.

44.     While a physician may lawfully prescribe an approved drug for indications or at dosages different than those set forth in the drug's labeling (*i.e.* for off-label users) if the physician deems it appropriate to do so, and may make an unsolicited request of a drug company concerning off-label information, the general rule is that a drug company is not permitted to market or promote its products for uses that have not received FDA approval and that the company's sales and marketing personnel may not discuss off-label uses with physicians during sales visits, at promotional events, or otherwise.

45.     FDA guidelines provide a few very narrow exceptions under which it would have been permissible for Defendants here to provide information concerning off-label uses.  Such exceptions would have permitted Defendants:

(a)     To provide unrestricted grants to accredited independent sponsors of continuing medical education programs, so long as Defendants did not influence

15

the content of the programs. This meant that, among other things, Defendants were not permitted to select the topics presented at such programs or approve speakers or the content of their speeches and materials. Such programs were required to be completely independent of the Defendants.

(b) To provide information regarding off-label uses to bona fide medical consultants, so long as the actual purpose of the consultation was to have the persons retained provide information to the Defendants.

(c) To communicate off-label information to physicians in response to a bona fide, unsolicited request from a physician, so long as such information was specifically responsive to the physician's request.

46. None of these exceptions permitted Defendants to bypass the requirement that they must provide fair and balanced information, regardless of the form in which they provided that information.

**C.** **Overview of the Federal Government's Dealings with the Defendants: Fraudulent and Illegal Conduct, False Statements, and Deliberate Acts to Evade FDA and Public Scrutiny, and to Promote Intron A and Temodar for Off-Label Uses, and Certain Other Illegal Conduct as to Intron A, Rebetron Combination Therapy and Temodar.**

47. On August 29, 2006, in the United States District Court for the District of Massachusetts, in the matter captioned *United States of America v. Schering Sales Corporation (A Subsidiary of Schering-Plough Corporation)*, No. 06-CR-10250, the United States of America filed a criminal Information ("Information"), based upon which Defendant Schering Sales pled guilty to one charge of criminal conspiracy to defraud the federal government. Defendants agreed to pay a total of $435 million to resolve, in significant part, that federal charge and associated criminal penalties and certain civil liabilities. (The averments of the Information are

16

incorporated by reference thereto in this Complaint as if fully set forth herein.)  This resolution of the federal government's investigation of the Defendants involves Defendants' illegal sales and marketing programs and other efforts, pursuant to which Defendants engaged in and conspired to commit on-going fraud, and then concealed that fraud by, among other things, providing false statements to the FDA to evade detection by FDA monitoring and evade FDA action that would have caused Defendants to end their illegal conduct, all relating to their promotions of, and kickbacks offered or paid to physicians as inducements for prescribing Intron A and Temodar for non-indicated off-label uses in violation of the Food, Drug and Cosmetic Act ("FDCA") and its implementing regulations, and certain other illegal conduct.

48.    According to the Information, between July 2001 and December 2003 alone, the illegal off-label promotional activities described in the Information, which had been directed by Defendants' "home office" and their co-conspirators, caused Defendants to obtain approximately $124,179,000 in before-tax profits to which they were not entitled.  The Information discusses a period of Defendants' conspiracy "from in or about early 1998 through in or about August 2001."   Upon information and belief, Plaintiff avers that related or similar conduct and conspiracies not identified in the Information, but which also involved illegal promotional, marketing, and sales activities by Defendants with respect to Intron A, Temodar, and Rebetron Combination Therapy, whether pertaining to off-label or indicated uses of those drugs, occurred as well and over a broader period than that identified in the Information.  Thus, Plaintiff believes, and therefore avers, that Defendants' improper activities with respect to these particular drugs were broader and more pervasive than that to which Defendants pleaded guilty.  Moreover, as discussed more fully below, Defendants also engaged in additional illegal marketing, promotional and sales activities involving one or more of the remainder of the Subject Drugs

17

over a period broader than that covered by the Information.

49.     Upon information and belief, the "relevant time period" for purposes of this Complaint, as defined in the Class definition, extends from January 1, 1995 through June of 2005.  The period may be even broader than that, but the exact dates are not known by Plaintiff or the Class because of Defendants' fraudulent concealment of their scheme and conspiracy.

50.     Although not mentioned in the Information, Defendants also engaged in additional fraudulent and illegal conduct, and formed conspiracies to carry out that conduct and to ensure that the goals of such conduct and conspiracies were successfully met, related to the off-label promotion of Intron A (by itself and as part of Rebetron Combination Therapy) and Temodar.  Such additional conduct included, for example, Defendants' provision of illegal inducements to physicians to start or to continue patients on these drugs and this therapy for illegal, unapproved uses (including, among other things, treatment for non-indicated conditions; treatment over durations in excess of those described in and permitted by their FDA-approved labeling; and treatment with doses exceeding that described in and permitted by their FDA-approved labeling) through various marketing programs of the Defendants, and by means of improper preceptorships, sham advisory boards, extravagant entertainment, and improper placement of clinical trials.  Moreover, upon information and belief, Defendants, with the full knowledge, support and assistance of the highest levels of their management, widely promoted the illegal, unapproved off-label uses (including excessive doses and excessive durations of use) of these drugs and this therapy in ways and in a scope much more pervasive than described in the Information.

51.     For instance, the United States of America, the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG-HHS"), TRICARE Management Activity

18

("TRICARE") and the Office of Personal Management ("OPM"), which administers the Federal Employees Health Benefits Program ("FEHBP"), entered into a Settlement Agreement and Release ("Settlement Agreement") with the Defendants.  This Settlement Agreement provides additional and broader contentions by the United States concerning improper and illegal conduct by the Defendants and/or broader time spans in which such conduct occurred than was charged in the Information.

52.    For example, in the Settlement Agreement, the United States contends that Defendants paid or provided various types of illegal remuneration to physicians in the form of improper preceptorships, advisory boards, entertainment, and placement of clinical studies in violation of federal statutes, to induce use of Temodar over a period from September 1999 through December 2003.  Likewise, the United States contends in the Settlement Agreement that Defendants, in violation of federal statutes, promoted the sale and use of Temodar for unapproved or off-label uses that were not medically accepted over the same period.  Thus, the period set forth in the Settlement Agreement extends the illegal conduct of Defendants through 2003, beyond the date of August 2001 as charged in the Information.  The United States further contended that the conduct at issue, with Defendants' knowledge, resulted in submission of false or fraudulent claims for Temodar to TRICARE, FEHBP and Medicaid and caused the Department of Veterans' Affairs ("DVA") to purchase Temodar under inappropriate circumstances and for improper use.

53.    Likewise, in the Settlement Agreement, the United States contended that Defendants, in violation of federal statutes, paid illegal remuneration to physicians for Intron A, encouraged improper billing by physicians of Intron A, and promoted Intron A for unapproved uses over the same period of September 1999 through December 2003, again beyond the period

charged in the Information.  The United States further contended in the Settlement Agreement that Defendants knowingly caused the submission of false or fraudulent claims to Medicaid, Medicare and TRICARE for Intron A, and caused the DVA to purchase Intron A under inappropriate circumstances and for improper purposes.  Although not fully detailed in the Information or Settlement Agreement, some of the fraudulent schemes of the Defendants are set out below.

**D.     Defendants' Conspiracy to Induce Prescriptions of Subject Drugs by Offering Improper Remuneration to Physicians.**

54.     During the applicable time period, Defendants engaged in a scheme and conspiracy with healthcare providers and others which was intended to induce, and did induce, providers to prescribe Subject Drugs to patients, despite the availability of less expensive, alternative courses of treatment.  Following are examples of practices used by Defendants which were intended to encourage, and did encourage, healthcare providers to prescribe Subject Drugs over less expensive, alternative courses of treatment.

**i.     Offering Kickbacks to Physicians in the Form of Samples of Intron A and Integrilin.**

55.     Defendants encouraged and facilitated the widespread provision of free vials of Intron A to physicians as an inducement to physicians.  How much the physician was given depended upon what the Sales Representatives negotiated.  It is attractive to such physicians because each 50 million unit ("MIU") vial provided as a "free sample" is worth over $500 in revenue to the physician.  Due to this inducement, the physician would then determine that it would be profitable to start or continue treating bladder cancer, melanoma, and other patients with Intron A.

56.     At times, Sales Representatives were armed with spreadsheets explicitly

20

illustrating to the physicians how much profit could be made by billing the free samples. For a period of years, Medicare reimbursement for Intron A in approximately 12 states was lower than the cost of the drug (to a physician). During said period of time, Defendants' Sales Representatives were specifically told to give free samples to make up the difference, in order to "keep the business."

57.     Upon information and belief, free samples have amounted to approximately 10% to 12% of all sales. In other words, for every 8-10 vials sold, 1 is given away free. The exact amount of free vials given to physicians is documented, and required by federal law to be retained.

58.     Free samples given to physicians were given informally at the discretion of Sales Representatives and also formally as part of Defendants' marketing programs.

59.     Upon information and belief, free samples of Integrilin were also furnished to physicians by the Defendants in the same manner as described above.

**ii.     Offering Kickbacks to Physicians in the Form of "Overfilled" Vials of Intron A**

60.     Another inducement tool used by Defendants, through Sales Representatives, was to communicate to physicians that he/she can purchase less Intron A that he/she bills for, because vials of Intron A are labeled as containing 25 MIU, but in fact contain 32 MIU (the difference being the "overfill").

61.     Defendants, from the national level down to the district level, taught and instructed their sales representatives to pitch physicians by telling them to purchase three "32 MIU" vials (which were labeled as "25 MIU" but had a seven unit overfill) and bill them as four separate "25 MIU vials, because 96 MIU was "close enough" to 100 MIUs. Physicians would thus profit by billing for 4 vials instead of the 3 vials actually purchased.

62.     Through Defendants' sales training sessions and/or sales training documentation, they had explained to Sales Representatives how they should pitch the physicians: Purchase three MIU vials (because each had a seven-unit overfill), and bill for four.  Accordingly, if three 25-MIU vials were purchased by the physician, the total amount of Intron A received would actually be 96 million units (which was "close enough" to 100 - the prescribed treatment at the time).  So, the physician bought a total of 74 MIU and billed for 100 MIU, profiting by approximately 33% ($250) for each patient (on the cost of the drug versus receipts alone).

63.     For multiple years up to 1999, District, Regional, and National Plan of Action meetings were conducted where Sales Representatives were taught to promote the Intron A 25 MIU solution vial, which contained a 7 MIU overfill.  Sales Representatives utilized the overfill tactic to facilitate physicians to obtain increased revenue and reduced costs, by instructing physicians to bill for 100 MIU when only 3x25 MIU vials (75 MIU total) were purchased.  The tactics were utilized heavily when the company was promoting a 100 MIU dose of Intron A for bladder cancer, until new studies in 1999 suggested a reduced amount.

64.     In or about 1999, a new dosage was suggested to be used with a new regimen, referred to as combination therapy.  The new dosage was 50 MIU Intron A, combined with 1/3 (strength) BCG.  As a result, another illegal sales tactic surfaced.  Sales Representatives began telling physicians that instead of wasting the other two-thirds of the BCG vial, to use it for 3 separate patients at the same time.  The process, sometimes referred to as "rack 'em and stack 'em," works as follows.  Physicians schedule three or more patients at one time to administer the doses.  The regimen calls for the consumption of one-third vial of BCG per patient.  Although the physician would use one-third vial for each patient by combining the administration for 3 patients at the same time, the physicians charged for one full vial for each patient, thereby

22

charging for two extra vials which were not used.

### iii.    Speaker Programs by ProEd Communications, Inc. to Market Intron A and Temodar.

65.    Defendants utilized a company known as Pro Ed Communications (hereinafter "Pro Ed"), located at 25101 Chagrin Blvd., Suite 230, Beachwood, OH 44122 (f/k/a "Annenberg") to conduct continuing medical education ("CME") speaker programs around the country to market the use of Intron A for bladder cancer, and Temodar for multiple off-label uses.

66.    Defendants' sales representatives themselves, however, would set up all aspects of the program and promote the program, and ProEd would implement and facilitate payment for each program.  ProEd was paid for providing this service from Defendants, and such payment was intended to include all expenses associated with the speakers, including the payment of "honorariums."   Many physician attendees (not speakers), at the Sales Representatives' discretion, had their travel expenses paid by affording them bogus preceptorships, honorariums, and grant money.  Sales representatives were encouraged and often required to provide these incentives to physicians.

### iv.    Melanoma First Start Program.

67.    One indication of Intron A is as an adjuvant (after) to surgery to prevent the recurrence of melanoma cancer.  The therapy regimen generally lasts one year, at 20 million units per meter squared, daily, for four weeks, followed by 10 million units per meter squared, three times a week, for eleven months.

68.    Defendants' "Melanoma First Start Program," which began in mid-1999, and lasted approximately one year, provided that for every new patient that a physician started on Intron A for malignant melanoma treatment, he or she would receive one free 50 MIU vial of

Intron A. Pushed heavily by upper management and Product Management in an effort to entice physicians to prescribe Intron A, these vials were provided at no cost to the physician.

**v.    Offering Kickbacks to Physicians in the Form of Sham Drug Trials.**

69.    Defendants set up "clinical trials" for existing FDA-approved drugs solely for the purpose of generating sales. Unlike legitimate clinical trials: (1) Most clinical trials were placed and partially managed by the Defendants' sales force, not its research division; (2) The sales force typically had knowledge of all aspects of the trials and regularly made joint calls with the Defendants' Project Managers to physicians; (3) The Sales Representatives lobbied to have the maximum number of trials in their territories due to the fact that clinical trials generate prescriptions, which helped Sales Representatives attain sales goals; (4) Many times, Sales Representatives and Project Managers would help a physician fill out clinical trial forms; (5) The sales force regularly consulted with Project Managers to check on the status of the trial's patient accrual (which correlates with additional sales); (6) Project Managers have outwardly admitted that their primary role is to generate sales for the sales force, not produce legitimate results from legitimate clinical trials; (7) Project Managers in 2001-2002 received a dual bonus system that rewarded them on patient accrual and sales force sales; (8) Project Managers have taken credit for Sales Representatives' success in generated sales dollars; and (9) Physician remuneration per patient was generally approximately $1,000.00, but Sales Representatives could have and did have marketing money deducted from their own budgets to increase such remuneration to the physicians.

70.    Defendants provided remuneration for clinical trials as a means to induce physicians to prescribe Intron A. The "research" performed had no legitimate value to Defendants and was merely a pretext for payments for referrals. Defendants withdrew the FDA

application (as it relates to an indication for superficial bladder cancer) in the early 1990s. At least 8-10 times Defendants stated that they had no intention of obtaining FDA approval for the use of Intron A in bladder cancer. Moreover, the study designs were not consistent with an attempt to eventually obtain FDA approval.

71.    The clinical trials began with the Defendants' Sales Representatives negotiating with the physician how much the physician needs in compensation, per patient, to conduct a trial. Thereafter, Defendants' "Project Manager" meet with the physician(s) and sets up the study.

72.    Typically, there were 10-50 patients in a study with a duration of 8-16 weeks. The physician would buy Intron A from a distributor (such as - upon information and belief - Oncology Therapeutic Network, Priority Healthcare f/k/a IV-1; and Florida Infusion), and then bill for the physician visits and the Intron A.

73.    The clinical trials also provided doctors with a billing opportunity for the physician visits and the Intron A that they prescribed under the trials. Under the clinical trials physicians also sometimes received free samples of Intron A, and also had the advantage of the "overfill" as applicable, which could be and was utilized for both clinical and non-clinical trial treatment.

74.    As a result, the physician receives approximately $1,000.00 per patient (a "kickback"), the exact amount subject to negotiation. They also sometimes receive free samples of Intron A, and also had the advantage of the "overfill" as applicable.

75.    Upon information and belief, trials of the type discussed herein pertaining specifically to Intron A and bladder cancer were not FDA registration trials. Such trials were designed to teach physicians to begin using Intron A for bladder cancer patients in the hopes that they would continue to treat bladder cancer with Intron A when the trials were completed.

25

76. Similarly, clinical trials involving Temodar, Rebetol, PEG-Intron and PEG-Intron Combination Therapy were routinely used by the Defendants and their co-conspirators as a pretext for the purpose of paying physicians to write prescriptions for off-label use.

### vi. Sham Speaker Fees Paid For by "Honorariums."

77. Defendants' Sales Representatives were able to and did pay "honorarium" fees to physicians. They were ostensibly compensation to physicians for agreeing to speak at a formal function, such as a dinner. In many instances, however, these "honoraria" were merely payoffs for prescriptions, with the physician never speaking at any formal function. They were also used to cover the cost of spouse travel, or any other additional physician needs. Defendants issued 1099s to each physician for these types of payments.

### vii. Sham Grants.

78. Defendants' Sales Representatives were allowed, and encouraged, to give "grants" to physicians, physician groups and medical facilities ostensibly for an educational or research program. There were two types of grants: (1) unrestricted and (2) restricted.

79. Upon information and belief, at least until approximately 1997 or 1998, certain Sales Representatives were encouraged to pay physicians, groups and companies in their territory, to do whatever they wanted with the grant money, in return for business. Often such grants were used to pay for spouses to travel to speaker meetings, to fund televisions for waiting rooms, or to meet other physician needs.

### viii. Sham Preceptorships.

80. The Defendants' "preceptorship" programs were ostensibly a teaching session in which a Sales Representative's physician (in his area) would agree to teach the Sales Representative certain technical aspects of his practice in exchange for a sum of money. In

actuality, preceptorships were often used by Sales Representatives to enable physicians to purchase office refrigerators and other items needed for office or personal use. Although Defendants paid thousands of physician preceptorships, the teaching sessions frequently never occurred.

81. In contrast to a pharmaceutical company that does not improperly use preceptorships as kickbacks, Defendants' Sales Representatives: (1) did not need manager approval to conduct preceptorships; (2) could perform unlimited preceptorships (including multiple times within the same physician group and multiple times with the same physician); (3) could pay as much as they wanted to the physician (usually between $500 and $1,000) and spend as much or little time with the physician as they wanted; (4) almost always used precepetorships for reasons other than education purposes, *e.g.*, to get to know the physician, pay the physician, or make up for some loss that a physician incurred; and (5) were told by the District Managers to "conduct a preceptorship," in response to a need to give financial inducement to physicians, not otherwise available.

### ix.    "Investigator" Meetings a/k/a "Speaker" Meetings.

82. "Investigator" meetings (a/k/a "speaker" meetings) were ostensibly called for the purpose of bringing together physicians (approved by Defendants) to talk about potential non-indicated uses of drugs. Because Defendants facilitated a direct bill situation, wherein Defendants' home office paid for all expenses directly, Sales Representatives across the country were allowed and instructed to spend lavishly on all physicians, both speakers and invitees.

83. Typically, a physician speaker was brought in to discuss off-label, non-indicated uses for certain of Defendants' products. Each attending physician was called an "investigator."

84. Each Sales Representative had the discretion to spend money (through his/her

own expense account) on physicians for lavish entertainment and gift-giving purposes, and the monies were often (but not always) spent during the various forms of meeting described herein. The type of entertainment was varied, such as fishing trips and hunting trips, wine tastings, theater and sporting event tickets. Gift-giving included free spa services ("Spa Dash"), free gift certificates to Home Depot ("Home Depo Dash"), free Christmas trees ("Christmas Tree Dash"), free satellite TV dish systems, and free VCRs.

### x.      Advisory Board Meetings.

85.      "Advisory Board Meetings" were for the ostensible purpose of obtaining feedback from physicians on drug performance, how they treat certain disease states, etc. In practice, they were used by Defendants on the District level (as opposed to home office-sponsored), as a cover-up for an "investigator meeting," in which off-label use of the products were promoted. During the Advisory Board's meetings, honorariums, lavish entertainment and expenses for physicians were paid for by Defendants.

### xi.      Remuneration to Physicians and/or their Non-Indigent Patients through Commitment to Care.

86.      "Commitment to Care" (hereinafter "CTC") was a Defendants-sponsored program, which was administered by a third-party named "Documedics, Inc." Documedics at all material times was located at 1250 Bayhill Dr., Suite 300, San Bruno, CA.

87.      CTC, among other services, administered a "patient assistance program." The program was designed to, and did, give patients and physicians financial assistance in conjunction with the prescribing of Intron A, Temodar, Eulexin, Rebetol, Rebetron Combination Therapy, and Fareston. Promoted by Defendants' home office, Sales Representatives were instructed to have physicians and/or patients give CTC their personal information. The CTC Program would then research all insurance coverage options and create a cost share program, up

28

to 100% if necessary (to keep the patient on the drug), purportedly based on patient income level. Defendants' "cost share" under the CTC Program varied and were specifically set forth pursuant to established internal code categories.

88.     The CTC program was far from a true charitable program for the benefit of indigent patients inasmuch as: (1) The assistance clearly afforded a billing opportunity which otherwise would not have occurred, but for the payment of patient co-payments and free drugs; (2) The assistance was not limited to approval or medically accepted indications for a product, and in fact was mostly utilized in off-label situations; (3) Although the program was managed through an independent organization (Documedics), it was controlled by Defendants; (4) Patient eligibility criteria upon which assistance was provided was not narrowly limited and tied to a patient's indigent status.  In fact, cash disbursements and/or free drugs were typically dispensed to non-indigents; and (5) Physicians themselves received cash disbursements and/or free drugs.

### xii.     Remuneration to a Select Handful of Physicians through Consultant Care Network.

89.     Funded by an education grant from Defendants, the "Consultant Care Network" ("CCN") was a program in which Sales Representatives were told to tell physicians that they could call the CCN for information on patient-specific issues as they relate to one of Defendants' drugs, both on and off-label information.  An operator at CCN would then leave a message for the next CCN physician on rotation to return the call.  In exchange for fielding such calls, physicians who were on rotation with CCN were paid an unknown amount for each call.

### xiii.     Free Physician Assistants for Doctors.

90.     On or about 2001 – 2002, Defendants donated several million dollars to a national physician assistant ("PA") organization called The American Academy of Physician Assistants. The purpose of the donation was purportedly to train and educate 80 PAs in gastroenterology and

29

Hepatitis C.

91.     The true reason for the program was for Sales Representatives to encourage and reward physician practices which would, for example, treat more Hepatitis C with Defendants drugs, by providing those physician practices with a free PA for a year.

### vii.     Free Nursing Services to Physicians through Defendants' In-house "Patient Care Consultants.

92.     Patient Care Consultants ("PCCs") were Defendants' in-house nurses that Sales Representatives directed to physicians' offices in need of patient side effect management, injection training, and any other services that the physicians' nurses would normally perform with patients.  There have been approximately 30-35 PCCs employed by Defendants at any one time, each assigned to a state.  PCCs attend sales meetings, give input, and work with the sales force to maximize sales at "targeted" locations.

### E.     Promoting Non-Covered Uses to Physicians.

93.     Defendants engaged in extensive and far-reaching campaigns to promote increased prescriptions of Intron A, Temodar and Rebetol/Rebetron Combination Therapy for off-label uses. Indeed, Sales Representatives were trained how to, and instructed to, make claims concerning efficacy for multiple off-label uses. Physicians could only learn of these off-label uses through the Defendants' sales force, as most of the uses were not published in compendia or respected, peer-review medical literature.

94.     Intron A off-label marketing has included: bladder cancer, chronic myelogenous leukemia, metastatic melanoma, perones disease and myeloma.

95.     Temodar off-label promotion has included: newly diagnosed anaplastic astrocytoma (AA), newly diagnosed glioblastoma multiform (GBM), refractory glioblastoma multiform (GBM), meningomas, oligodendrogliomas, brain metastasis from primary tumors

(colon, melanoma, breast, and lung cancer), malignant melanoma, extended therapy usage, combination therapy usage with radiation, combination therapy usage with various other chemotherapy agents, and all other known brain tumor types.

96.     In order to successfully carry out the off-label promotion, Defendants conducted national sales meetings, and regional and district Plan of Action meetings, designed specifically for the purpose of training representatives on off-label sales and marketing practices. Moreover, the Product Management Department also conducted yearly, quarterly, and semi-annual meetings communicating the targets for off-label sales. Indeed, Sales Representatives were trained by Defendants' Training Department and district trainers on off-label marketing techniques such as: (1) copying and distributing studies, abstracts, reviews, and CME monographs published by Defendants on off-label usage; (2) sales calls solely for the purpose of off-label selling; (3) educating physicians on reimbursement/coding so that off-label claims would be covered for their patients.

97.     Uniform and widespread tactics used by Defendants to promote off-label, in conjunction with kickbacks, included: (1) Third Party "CME" Speaker Programs via Pro-Ed to promote only off-label usage. These programs were controlled, promoted, designed, and had little, if anything, to do with the advertised content of the program; (2) CME programs for physicians under the guise that the programs were on-label. For instance, programs would be entitled with general titles, such as "Malignancies of the Brain" for Temodar, or "Updated in Urological Malignancies" for Intron A, both of which were disguises for off-label marketing speaker programs; (3) Regional/District Advisory Board Meetings, which were actually marketing meetings to promote off-label usage as presented by paid physicians who spoke on off-label usage only; (4) National Advisory Board Meetings, which were merely marketing

meetings to promote off-label usage as presented by paid physicians who spoke on off-label usage only; (5) Speaker's Training Meetings, which were merely marketing meetings to promote off-label usage as presented by paid physicians who spoke on off-label usage only; (6) Investigator Meetings, which were merely marketing meetings to promote off-label usage as presented by paid physicians who spoke on off-label usage only; (7) Off-label clinical trials, which were purported clinical trials that actually were designed to generate additional off-label sales, and not research. To date, Defendants have not, and have no expressed intention of filing an NDA for the off-label clinical trials; and (8) The "Consultant Care Network," a service where physicians could speak with paid physicians regarding how to use Temodar®, for instance, in off-label disease states.

98.    The decision-making of the physician was completely undermined by the off-label marketing of Defendants. The physicians prescribing Defendants' products off-label did not do so because they believed, based on their review of peer-reviewed, medical literature or discussions with their colleagues, that the drugs would help their patients; rather the drugs were prescribed because the physicians were actively pursued by Defendants with little or no data on off-label uses, coupled with the unlawful kickbacks described elsewhere in this Complaint.

**F.    The Information, Settlement Agreement, CIA and other Manifestations of the Government's Findings with Respect to, Dealings with, and Responses to Defendants' Illegal Conduct.**

99.    The Information is silent as to many of the improper and illegal marketing, promotional and sales practices discussed above in this Complaint, including, among other things, such practices relating to PEG-Intron, PEG-Intron Combination Therapy, and Rebetron Combination Therapy. The Settlement Agreement, however, sets forth the United States' contention that Defendants, as part of their marketing, promotional and sales practices for "PEG-Intron, Rebetron and PEG-Intron Combination Therapy" for patients with Hepatitis C,

knowingly and willfully offered and paid illegal remuneration to induce physicians to start patients on drug therapy for Hepatitis C in violation of federal statutes through three distinct improper sales and marketing programs.  The period ascribed to this conduct was January 1999 through December 2002.

100.    Specifically, the Settlement Agreement contends that:

"as part of Schering's sales and marketing practices for PEG-Intron, Rebetron, and PEG-Intron Combination Therapy for patients with Hepatitis C from January 1999 through December 2002, Schering knowingly and willfully offered and paid illegal remuneration to induce physicians to start patients on drug therapy for Hepatitis C in violation of 42 U.S.C. § 1320a-7(b)(2) through three improper sales and marketing programs: the ReCAP program, which paid physicians up to $500 for each patient begun on drug therapy for Hepatitis C; the Physician Assistants ("PA") Fellowship Program, which placed Schering-funded physician assistants in busy physician practices; and Low Quintile Advisory Board programs, which paid physicians for attendance at Schering-sponsored events."

101.    Also as part of the settlement to resolve the federal government's charges and the civil liabilities, Schering-Plough has entered into an Addendum to a previously-existing CIA with the HHS-OIG.  The prior CIA arose out of an investigation into other improper and illegal sales, marketing and pricing activities of Defendants.  Among other things, the Addendum to the CIA requires Schering-Plough to continue to monitor and correct shortcomings in its sales, marketing, promotional and pricing activities.

102.    Plaintiff and the Class have filed this action because the agreement to resolve the federal government's investigation against the Defendants will not (or will not fully) compensate Plaintiff and the Class for all of the damages they have suffered and all of the damages to which they are entitled under all applicable laws.

103.    Defendants have concealed from the public the details of their underlying fraudulent and other illegal conduct not only during the time that they engaged in that conduct so

33

as to avoid detection and cessation of their ill-gotten profits, but even to this day to avoid public scrutiny, any concomitant negative perception of their business, and liabilities to Plaintiff and members of the Class resulting from civil litigation. Defendants still have not provided the public with the details of their conduct, notwithstanding that the Massachusetts U.S. Attorney's office first served Defendants with subpoenas to investigate the specific conduct related to some or all of these Subject Drugs at least as early as November of 2002.

104.    Schering-Plough's 2003 Annual Report indicates hundreds of millions of dollars in litigation reserves for the Massachusetts U.S. Attorney's investigation, as well as certain other federal and state investigations of Schering-Plough. Schering-Plough's 2005 Annual Report states that litigation reserves had been increased by $250 million, resulting in a total reserve of $500 million "representing the Company's current estimate to resolve the Massachusetts investigation" as well as certain other federal and state investigations. Yet, despite the length of time of the investigation, the prior anticipation of having to pay hundreds of millions of dollars, and now the agreement to pay those dollars to resolve the federal government's charge, Defendants still have not come clean with the actual details of their illegal conduct.

105.    The Information charges one count of conspiracy under 18 U.S.C. § 371 (conspiracy to commit offense or defraud United States, in that case involving a conspiracy to violate 18 U.S.C. § 1001 through, among other things, the making of false statements to the federal government). As part of their agreement to resolve the federal investigation into Defendants' improper sales, marketing and promotional activities, Defendants have pled guilty to this single charge and to pay $435 million. Nonetheless, as alleged throughout this Complaint, Defendants' improper promotional activities were much broader and pervasive than its plea of guilty to this one charge of criminal conspiracy might suggest.

34

106. For its part, the Information alleges that Schering Sales marketed and sold drugs manufactured by Schering-Plough through a nationwide sales force that was divided among business units, one of which was the oncology and biotechnology business unit ("OBBU"). The OBBU focused on sales of drugs in oncology and hepatitis, including Intron A and Temodar. (Though not mentioned in the Information, it is believed, and therefore averred, that the OBBU also focused on sales of Rebetol and/or combination therapy.) According to the Information, Defendants sold and marketed Intron A and Temodar directly to physicians across the country through the OBBU sales force, and the sales force also attended physician conferences which they expected would also be attended by physicians who had possible interests in these drugs.

107. As mentioned above, the Information focused on a narrow conspiracy period "[f]rom in or about early 1998 through in or about August 2001." The Information alleges that during that period, Schering Sales conspired with others and knowingly made material false and fraudulent statements to agencies of the federal government — to wit, the FDA — the purpose of which was to enrich the Defendants and to keep monies to which they were not entitled. Defendants made these false statements to avoid the FDA's scrutiny of Defendants' promotion of Intron A and Temodar for off-label uses, which resulted in the Defendants acquiring $124,179,000 in before-tax profits which they would not otherwise have acquired.

108. The details of Defendants' fraud and conspiracy alleged in the Information are hereby adopted as one part of the fraudulent schemes, conspiracies and other actionable conduct undertaken by the Defendants to defraud Plaintiff and members of the Class. Certain of these details that are now known (and knowable) are set forth below.

109. Schering Sales and its co-conspirators, on June 29, 2001, received a letter dated June 28, 2001, from the FDA's Division of Drug Marketing, Advertising and Communications

("DDMAC"). This letter discussed a May 2001 commercial exhibit hall booth maintained by Defendants, which they staffed with OBBU sales force representatives, at the 37th American Society of Clinical Oncology ("ASCO") Annual Meeting in San Francisco, California. In the letter, the FDA advised the Defendants that the DDMAC had discovered promotional activities of the Defendants that violated the FDCA and its regulations. It further advised that Defendants had provided "'false or misleading efficacy information about Temodar to visitors at the commercial exhibit hall both [sic in Information]' at the ASCO meeting and that 'Schering also promoted Temodar for the unapproved use in first line therapy of anaplastic astrocytoma." The DDMAC told Defendants to "immediately cease making such violative statements and any other promotional activities or materials for Temodar that make the same or similar claims or presentations." The DDMAC directed Defendants to provide the FDA with a written response by July 13, 2001, including the date on which "this and other similarly such violative materials were discontinued."

110. When the FDA issued its letter to Defendants, Defendants and their coconspirators knew and understood that the OBBU sales force was engaged in the pervasive off-label promotion for unapproved uses of Intron A for bladder cancer and Temodar for uses other than the treatment of refractory analpiastic astrocytoma. In fact, this pervasive off-label promotional activity was actively directed by Defendants' "home office," which had employed various means to guarantee the OBBU sales force's aggressive pursuit of Intron A and Temodar sales for such unapproved uses. Such off-label sales were so important to Defendants, including to Schering's home office, that "Schering Sales and its co-conspirators knew and understood the sales representatives would be done with their week's work 'at noon Monday' if they did not promote Temodar and Intron A for unapproved uses."

36

111.    According to the Information, the means directed and employed by home office to guarantee such aggressive pursuit of off-label sales of Intron A and Temodar included:

(a) Training the sales force to pursue off-label sales through training classes, ride-alongs with managers, district meetings, teleconferences, and sales meetings;

(b) Targeting off-label sales through an action plan provided to the sales force by the marketing department;

(c) Providing the sales force with for your information only scientific articles and abstracts from headquarters for use with physicians;

(d) Requiring the sales force to prepare business plans emphasizing detailed promotional goals to acquire off-label sales;

(e) Evaluating, and handsomely compensating, the sales force by their success in achieving sales for off-label uses; and

(f) Providing the sales force with substantial budgets for advisory boards, speakers, entertainment, and preceptorships to assist in attaining off-label sales.

112.    On or about June 29, 2001, certain employees of Schering Sales met to determine how to respond to the FDA's letter of June 28, 2001.  Thereafter, on or about July 12, 2001, Schering Sales and its co-conspirators "caused a written response to be submitted to the FDA" which falsely stated that the statements identified by the FDA were an "an isolated incident' and 'certainly inconsistent with the direction provided by the home office,' despite the fact that Schering Sales and its co-conspirators knew and were directing the OBBU sales force to engage in widespread off-label marketing" of Intron A and Temodar for the unapproved uses.

113.    The written response to the FDA contained false assurances designed to make the FDA believe, that Defendants would act to remedy the improper off-label promotional activities,

37

so as to escape further scrutiny and actions by the FDA pertaining to Defendants' illegal off-label promotional activity. Defendants' response falsely stated they would market Temodar only in accordance with the indications provided in its labeling and that they would send an electronic message to all Temodar sales representatives discussing the "importance of appropriate and accurate promotion" and reminding the sales force "that they may only discuss the approved indication for this product." However, when Defendants sent their response to the FDA, Schering Sales and its co-conspirators knew that the electronic message was a falsehood and was not intended to deter the sales force's improper promotional activities "because it would be substantially overridden by the training, incentives, and support to promote off-label uses of the drug."

114. On August 2, 2001, in express reliance upon Defendants' false statements and representations (which, of course, the FDA did not know to be false at the time) contained in Defendants' July 12, 2001 letter to the FDA, the FDA issued a letter to the Defendants advising that it regarded the matter closed. In so doing, the FDA stated that it was relying on Defendants' affirmations that the statements of the sales representatives at issue were "an isolated incident" and "not consistent with the direction provided by the Schering home office" and that Defendants sent the electronic message to all "Sehering Temodar sales representatives to reinforce the importance of appropriate and accurate promotion and highlight issues discussed in DDMAC's June 28, 2001 untitled letter, and to instruct them that they may only discuss the approved indication for Temodar."

115. As already discussed, the breadth, nature and period of the illegal conduct of the Defendants pertaining to Intron A and Temodar is wider than the partial account and duration set forth in the Information, and also includes illegal kickbacks, bribes, payments of remuneration

and other inducements to physicians to prescribe Subject Drugs for approved and unapproved uses.

116. In addition to the prior allegations above, for example, the Massachusetts U.S. Attorney's Press Release of August 29, 2006 refers to broader, systemic conduct than that charged in the Information, all of which is adopted herein as part of the schemes, conspiracies and other actionable conduct undertaken by the Defendants to defraud Plaintiff and the Class.

117. First, the Press Release states, and it is averred herein, that Defendants "induced physicians to start patients on Intron A for hepatitis C [an approved use) by paying them remuneration through three marketing programs." Upon information and belief, it is averred herein that such remuneration may have included cash payments of up to $500.00 for each patient started on Intron A therapy. (As discussed below, upon information and belief it is also averred herein that such remuneration was not limited to patient start-ups on Intron A, but was also paid to physicians to start hepatitis C patients on PEG-Intron.)

118. Second, the Press Release states, and it is averred herein, that Defendants "induced physicians to use Temodar for certain patients with brain tumors and brain metastases and to use Intron A for certain patients with superficial bladder cancer through improper preceptorships, sham advisory boards, lavish entertainment, and improper placement of clinical trials." Use of Temodar and Intron A for these conditions constituted off-label uses, the promotion of which was improper and illegal. Among other things, the Defendants' conduct amounts to unlawful kickbacks in violation of federal law and state bribery laws.

119. Third, the Press Release states, and it is averred herein, that Defendants "knowingly promoted off label uses of Temodar for certain brain tumors and brain metastases and Intron A for superficial bladder cancer despite not having FDA approval."

120. Finally, as discussed above, in the Settlement Agreement with the Defendants, the United States contended that Defendants engaged in certain fraud, conspiracies and other illegal conduct specific to Intron A and Temodar. Plaintiff incorporates by reference herein those contentions in the Settlement Agreement relating to Intron A and Temodar as part of the schemes, conspiracies, and other actionable conduct in which the Defendants engaged to defraud Plaintiff and members of the Class.

121. As discussed above, in the Settlement Agreement with the Defendants, the United States contended that Defendants engaged in certain fraud, conspiracies and other illegal conduct specific to PEG-Intron (and Rebetron and PEG-Intron Combination Therapy). More specifically, the United States contended that Schering knowingly and willfully offered and paid illegal remuneration to induce physicians to start patients on drug therapy for hepatitis C in violation of 42 U.S.C. § 1 320a-7b(b)(2) through three improper sales and marketing programs: (1) the ReCAP Program, which paid physicians up to $500 for each patient begun on drug therapy for hepatitis C; (2) the Physician Assistants ("PA") Fellowship Program, which placed Schering-funded physician assistants in busy practices; and (3) Low Quintile Advisory Board Programs, which paid physicians for attendance at Schering-sponsored events. These three programs were employed to induce physicians to prescribe some of the Subject Drugs to patients.

122. Such conduct amounts to unlawful kickbacks and other violations of federal law, as well as violations of state bribery laws. Plaintiff incorporates by reference herein those contentions contained in the Settlement Agreement relating to PEG-Intron and Rebetron and PEG-Intron Combination Therapy as part of the schemes, conspiracies, and other actionable conduct in which the Defendants engaged to defraud Plaintiff and members of the Class.

40

## V.     FRAUDULENT CONCEALMENT AND TOLLING OF LIMITATIONS

123.     Plaintiff had no knowledge of any of fraud and fraudulent schemes, illegal off-label promotional activities, illegal sales and marketing programs and conduct, kickbacks, bribery, payments or provision of illegal remuneration, conspiracies and concerted activities, or other unlawful conduct alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, until the earliest date of August 29, 2006 when the United States of America filed its criminal Information setting forth the charge of conspiracy to make false statements to the FDA and the Massachusetts United States Attorney issued its Press Release reporting on the resolution of that charge and certain associated civil liabilities.

124.     Plaintiff could not have discovered the unlawful conduct alleged herein at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by all of the Defendants and their co-conspirators to avoid detection of, and to conceal, their unlawful conduct and conspiracies.  These techniques of secrecy included, but were not limited to, secret meetings and communications, the creation of enterprises to perpetrate and mask Defendants' illegal conduct, the making of false and fraudulent statements about their conduct to governmental authorities and the public, creation of fraudulent studies regarding the usefulness and effectiveness of their drugs, secret bribes and kickbacks to physicians and the creation of secret programs to effectuate those bribes and kickbacks, and other conduct alleged herein, all intentionally designed to avoid detection of their illegal schemes and activities.  To this day, Defendants continue to conceal the details of their conduct from the public, including Plaintiff and the Class.

125.     By reason of the foregoing, the claims of Plaintiff and members of the Class are timely under any applicable statute of limitations (as tolled by the filing of this Class Action

41

Complaint) pursuant to the discovery rule and the doctrine of fraudulent concealment.

126.    The Defendants have been aware of their unlawful conduct and conspiracies since the inception of such conduct.  To this day, however, despite Defendants' awareness of their unlawful conduct and their knowledge of the federal investigation of their conduct and their setting of litigation reserves in the hundreds of millions of dollars relating to the investigation, and now their resolution of the charge by the United States of America, Defendants continue to conceal from the public, including Plaintiff and the Class, the full details of their unlawful conduct.

127.    The Defendants' failure to properly disclose their unlawful conduct and conspiracies, and other acts and omissions as alleged herein, was and is willful, wanton, malicious, outrageous, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of Plaintiff and members of the Class.

## VI.    DEFENDANTS' MOTIVES AND CAUSATION OF DAMAGES

128.    Defendants' motive in creating and operating the fraudulent scheme and conspiracy, including and/or in addition to the provision of illegal remuneration and illegal inducements to physicians as described herein, was to obtain additional revenues and profits from the marketing, promotion and sale of the Subject Drugs.

129.    At least with respect to Intron A and Temodar, and as intended and designed, Defendants' fraudulent scheme caused Plaintiff and members of the Classes to pay for these drugs for uses and to treat medical conditions for which the drugs were ineffective, including the treatment of conditions for which use of these drugs was not approved by the FDA.  Plaintiff and members of the Class who paid for these drugs in whole or in part based upon uses and conditions that were not approved by the FDA, paid for drugs which provided no greater relief

42

from, or treatment of, the medical conditions than a placebo would have provided. Had Defendants not engaged in this improper conduct, Plaintiff and members of the Class who paid for these drugs would not have paid what they did for these drugs, or other drugs would have been utilized or prescribed which cost less.

130.    Additionally, as alleged herein, Defendants also promoted some or all of the Subject Drugs that are the subject of this Class Action Complaint for use over durations and/or for use in doses that substantially exceeded those durations and doses approved by the FDA, even in those instances where the Subject Drugs were being taken for medical conditions for which they were indicated as effective. In such instances involving promotion of excessive durations or excessive doses, as intended and designed, Defendants' fraudulent scheme caused Plaintiff and members of the Class to over-pay for these Subject Drugs by virtue of purchasing higher quantities of the Subject Drugs. Had Defendants not engaged in this improper conduct, members of the Class – even in those instances where the Subject Drugs were used to treat medical conditions for which they were effective – would not have paid what they did for these Subject Drugs.

131.    Other treatment options and medications exist for the medical conditions for which Defendants promoted the Subject Drugs. It was a goal of Defendants' fraudulent scheme and conspiracy to have doctors prescribe the Subject Drugs over all alternative courses of therapy.

132.    As alleged above, with respect to the Subject Drugs, Defendants also engaged in the fraudulent schemes, conspiracies, and other illegal and improper conduct in the form of kickbacks, payments of illegal remuneration and provision of other inducements to physicians for them to prescribe these Subject Drugs even though such use may have been for indicated

43

medical conditions.  These bribes, kickbacks and illegal remuneration and inducements caused Plaintiff and members of the Class to over-pay for these Subject Drugs administered by physicians who were induced by Defendants with illegal remuneration and inducements to prescribe these drugs over alternative treatment and medication.

## VII.    CLASS ACTION ALLEGATIONS

133.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of itself and a Class, defined as follows:

> All persons and legal entities in the United States and its territories that, for purposes other than resale, purchased, reimbursed and/or paid for Eulexin, Intron A, Rebetol/Intron A Combination Therapy, Temodar, PEG-Intron, Rebetol and Rebetol/PEG-Intron Combination Therapy, Integrilin and/or Fareston from January 1, 1995 through June 2005 based upon payments that were approved only because of Defendants' illegal off-label marketing scheme for which Defendants were unjustly enriched.  For purposes of the Class definition, persons and other entities "purchased" these drugs if they paid all or part of the purchase price.

Excluded from the Class are (a) Defendants and any entities in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors and (b) any co-conspirators.  Also excluded from the Class are any judges or justices to whom this action is assigned, together with any relative of such judge(s) or justice(s) within the third degree of relationship, and the spouse of any such person.

134.    Plaintiff contends that this suit is properly maintainable as a class action pursuant to Rules 23 (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

## NUMEROSITY

135.    The Class consists of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1).  The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

## TYPICALITY

136.     The claims of the representative Plaintiff Teamsters Local 346 Health Fund are typical of the claims of the Class, as required by Rule 23(a)(3), in that Teamsters Local 346 Health Fund, like all Class members, purchased and/or paid for Defendants' Subject Drugs.  Like all members of the Class, Teamsters Local 346 Health Fund has been damaged by Defendants' misconduct, in that, among other things, it paid for Subject Drugs while Defendants were actively engaged in their fraudulent marketing, promotion and sales scheme and conspiracy.

## COMMON QUESTIONS OF LAW AND FACT

137.     The factual and legal bases of Defendants' fraudulent marketing and sales scheme and conspiracy are common to all members of the Class and represent a common thread of misconduct resulting in injury to Plaintiff and all members of the Class.

138.     Questions of law and fact common to Plaintiff and the Class abound in this case, and those questions predominate over any questions affecting individual Class members, within the meaning of Rule 23(a)(2) and (b)(3).  These common questions of law and fact include, but are not limited to, the following:

        (a)     Whether Defendants engaged in the fraudulent marketing, promotion and sales scheme and conspiracy alleged herein;

        (b)     Whether the conspiracy was implemented;

        (c)     Whether Intron A, Temodar and combination therapy are medically necessary for uses not approved by the FDA;

        (d)     Whether Defendants engaged in a fraudulent and/or unfair deceptive scheme of improperly marketing, promoting and selling Intron A, Temodar and/or combination therapy to treat conditions for which these Subject Drugs were not approved by the FDA;

        (e)     Whether Defendants engaged in a fraudulent and/or unfair deceptive scheme of improperly marketing, promoting and selling Intron A, Temodar and/or Rebetron Combination Therapy for conditions for which

these Subject Drugs were not medically safe, efficacious, effective or useful;

(f)     Whether Defendants engaged in a fraudulent and/or unfair deceptive scheme of improperly marketing, promoting and selling any of the Subject Drugs for durations of use or in dosages that exceeded or were otherwise outside the scope of FDA approval or that were not medically safe, efficacious, effective or useful;

(g)     Whether Defendants coached or instructed physicians or others on how to conceal the off-label nature of Intron A, Temodar and/or combination therapy on claim forms submitted by or to patients and members of the Class;

(h)     Whether Defendants prepared, funded and published studies and other materials which contained false information and misrepresentations regarding off-label uses, or the validity of or propriety of or scientific and other support for, off-label uses of Intron A, Temodar and/or combination therapy;

(i)     Whether, and on how many occasions, Defendants provided false information and made false statements to the federal government regarding their off-label promotional practices pertaining to Intron A, Temodar and/or combination therapy;

(j)     Whether Defendants utilized others and/or engaged in conspiracies to assist in the publication and dissemination of false statements, or fraudulent studies, to physicians concerning off-label uses of Intron A, Temodar and/or combination therapy;

(k)     Whether Defendants used kickbacks, bribes and/or other payments or provision of illegal remuneration to induce physicians to prescribe, administer, or otherwise treat patients with any of the Subject Drugs, whether or not such prescribing, administration, or treatment was for medical conditions that were FDA-approved;

(l)     Whether Defendants engaged in a pattern and practice with the intent of deceiving and defrauding Plaintiff and the Class and with the intent of suppressing the unlawful conduct and conspiracy;

(m)     Whether Defendants violated state consumer protection statutes including the Consumer Protection Act of Massachusetts;

(n)     Whether Defendants are liable under state conspiracy and/or state concert of action laws;

46

(o)     Whether Defendants unjustly enriched themselves at the expense of Plaintiff and members of the Class;

(p)     Whether Defendants' illegal bribes, kickbacks, payments of illegal remuneration and/or other illegal inducements provided to physicians and other medical providers directly and proximately caused Plaintiff and members of the Class to pay for any of the Subject Drugs, or to pay more for the Subject Drugs than they otherwise would have paid either for those specific Subject Drugs or for an alternative drug or treatment, whether or not the Subject Drugs for which Plaintiff and the members of the Class paid were for FDA-approved uses;

(q)     Whether Defendants engaged in a pattern or practice that directly and proximately caused Plaintiff and members of the Class to pay for any of the Subject Drugs for non-medically necessary uses, for uses not approved by the FDA, or in doses or for durations of use that were not approved by the FDA or that were not medically necessary;

(r)     Whether Plaintiff and the Class are entitled to compensatory damages, and, if so, the nature of such damages;

(s)     Whether Plaintiff and members of the Class are entitled to punitive damages, treble damages or exemplary damages and, if so, the nature of such damages;

(t)     Whether Plaintiff and members of the Class are entitled to equitable relief pursuant to their claim for unjust enrichment or otherwise; and

(u)     Whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, prejudgment interest, post-judgment interest and costs of suit.

## ADEQUACY

139.    Plaintiff will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4). Plaintiff has retained counsel with substantial experience and expertise in the prosecution of both statewide and nationwide class actions. Plaintiff and its counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor counsel have any interests adverse to those of the Class.

47

**SUPERIORITY**

140.    Plaintiff and members of the Class have suffered harm and damages as a result of Defendants' unlawful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Rule 23(b)(3).  Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

141.    The prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class.  These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be dispositive of the interests of the other class members not parties to the adjudications or would substantially impair or impede their ability to protect their interests.

142.    Defendants also have acted or refused to act on grounds generally applicable to all members of the Class, thereby making appropriate declaratory relief with respect to the Class as a whole.

## VIII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Massachusetts Consumer Protection Act
### M.G.L.A. Pt. I, T. XV, Chpt. 93A

143.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

144.    Plaintiff and the members of the class paid for the Subject Drugs due to the

described misrepresentations, omissions, non-disclosures and concealment of material facts, and other fraudulent conduct.  Such conduct was directed to, and acted upon, by physicians and health care providers, and affected their patients, for whom Plaintiff and members of the Class paid for the Subject Drugs.  Such conduct is actionable under the consumer protection statutes of Massachusetts.  As a direct and proximate result of this conduct of Defendants, Plaintiff and the Class have suffered damages in an amount to be determined at trial, and are entitled to compensatory damages, treble damages, attorneys' fees and costs of suit, and any other damage provided by these statutes.

145.    In distributing, marketing, and selling Defendants' drugs, Defendants are engaging in "trade or commerce" within the meaning of M.G.L.A. 93A § 2.

146.    In purchasing or paying some or all of the cost of the Subject Drugs, Plaintiff Teamsters Local 346 Health Fund, is a business engaged in "trade or commerce" within the meaning of M.G.L.A. 93A § 11.  The putative Class includes both businesses and individuals.

147.    Defendants' conduct as set forth herein constituted "unfair or deceptive acts or practices" under Massachusetts law.  *See* M.G.L.A. 93A § 2.

148.    The actions and transactions constituting the unfair and deceptive acts and practices of the Defendants occurred primarily and substantially within the commonwealth of Massachusetts.

149.    The unfair and deceptive acts and practices of Defendants as alleged herein caused an ascertainable loss of money or property to Plaintiff and other members of the Class, within the meaning of the Massachusetts Consumer Protection Act, M.G.L.A. 93A §§ 9 & 11.

WHEREFORE, Plaintiff, on behalf of itself and the members of the Class, respectfully seeks the relief set forth below.

**SECOND CLAIM FOR RELIEF**
**Conspiracy/Concert of Action**

150.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

151.   Beginning at least as early as January 1, 1995, the exact date being unknown to Plaintiff and the Class, and continuing thereafter through at least June 2005, Defendants and their co-conspirators, as described above, engaged in a continuing conspiracy and/or concerted action to violate federal and state laws and to defraud Plaintiff and the Class by causing Plaintiff and the Class to pay for these Subject Drugs for off-label uses that were not approved by the FDA and were not scientifically proven to be safe, efficacious, effective or useful for the conditions for which such Subject Drugs were prescribed, administered or otherwise provided and for which Plaintiff and the Class made payments.   In the absence of Defendants' conspiracy and/or concerted action, Plaintiff and the Class would not have paid for these Subject Drugs at all.

152.   Additionally, even in instances in which these drugs were provided to and purchased by Plaintiff and the Class for conditions approved by the FDA, Plaintiff and members of the Class over-paid for these Subject Drugs due to Defendants' promotion of doses and durations of use that were not approved by the FDA and that were not scientifically proven to be safe, efficacious, effective or useful.   In the absence of Defendants' conspiracy and/or concerted action, Plaintiff and members of the Class would have paid much less for them or would not have purchased them at all.

153.   In addition, Plaintiff and members of the Class paid for these Subject Drugs due to kickbacks, bribes, and payment or provision of illegal remuneration or other inducements.  In the absence of Defendants' conspiracy and/or concerted action, Plaintiff and the Class would not have paid for these Subject Drugs or would have paid much less for them or for other drugs or

treatments.

154.    As detailed above, Defendants have agreed to resolve the federal government's charge of criminal conspiracy to defraud the United States involving Defendants' conspiracy to violate 18 U.S.C. § 1001 through, among other things, the making of false statements to the federal government pertaining to Defendants' off-label promotional activities for these Subject Drugs.  Defendants have already agreed to plead guilty to this charge, which Plaintiff believes covers a portion of Defendants' entire course of illegal conduct - and to pay hundreds of millions of dollars to settle the entire federal criminal investigation into their illegal conduct.

155.    Pursuant to their conspiracy and/or concerted action alleged herein, Defendants and their co-conspirators engaged in a wide range of activities the purpose and effect of which was to defraud the Plaintiff and the Class.  These activities have been set forth in great detail above and throughout this Complaint, and have been incorporated by reference herein, including, but not limited to, the following activities:

(a)    Defendants discussed and agreed among themselves and with their co-conspirators to offer, provide and accept kickbacks and bribes in exchange for further improper sales of these Subject Drugs for both indicated and off-label uses, thereby resulting in the Defendants obtaining additional revenues and profits from the illegal promotion and sale of these Subject Drugs for both indicated and off-label uses; and

(b)    Defendants discussed and agreed among themselves and with their co-conspirators to create the above-alleged fraudulent scheme to carry out their common purpose and goal of deriving huge profits from their illegal and improper promotions of these Subject Drugs for off-label uses as well as their illegal and improper promotions of these Subject Drugs for indicated uses.

156.     Defendants' conspiracy and concerted actions have directly and proximately caused Plaintiff's and the Class members' damages.  As a direct and proximate result of Defendants' conspiracies and/or concerted actions perpetrated upon Plaintiff and the Class, Defendants are jointly and severally liable to Plaintiff and the Class for all damages they have sustained, plus exemplary damages and, punitive damages, as well as the cost of suit and reasonable attorneys' fees.

WHEREFORE, Plaintiff, on behalf of itself and the members of the Class, respectfully seeks the relief set forth below.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment

157.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

158.     By engaging in the conduct described in this Complaint, Defendants have knowingly obtained benefits from Plaintiff and the Class under circumstances such that it would be inequitable and unjust for these Defendants to retain them.

159.     Defendants have collected payments for these Subject Drugs from Plaintiff and the members of the Class that vastly exceeded the payments to which Defendants were entitled as a matter of law.  In exchange for these payments, and at the time they made these payments, Plaintiff and members of the Class expected that these Subject Drugs were safe, medically efficacious, effective and useful for the particular conditions or symptoms for which they were prescribed; and/or that these Subject Drugs, in instances where these Subject Drugs were provided for FDA-approved conditions, were also being provided and administered in doses and over durations that were FDA-approved; and/or that physicians were not prescribing these Subject Drugs due to Defendants' kickbacks, bribes, or payment or provision of illegal

remuneration or other illegal inducements. Plaintiff and the Class would not have paid what they did for these Subject Drugs in the absence of Defendants' wrongful conduct.

160. Thus, Defendants will be unjustly enriched if they are permitted to retain the full amounts paid to them by Plaintiff and the members of the Class.

161. Plaintiff and the members of the Class are therefore entitled to an award of compensatory and punitive damages in an amount to be determined at trial or to the imposition of a constructive trust upon the wrongful profits obtained by, revenues obtained by, and benefits conferred upon Defendants as a result of their wrongdoing and the payments made by Plaintiff and members of the Class.

162. Plaintiff and the members of the Class have no remedy at law to prevent Defendants from continuing the inequitable conduct alleged herein and the continued unjust retention of the payments made to Defendants by Plaintiff and members of the Class.

WHEREFORE, Plaintiff, on behalf of itself and the members of the Class, respectfully seeks the relief set forth below.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff individually and on behalf of the Class demands judgment against Defendants in each claim for relief, jointly and severally, and as follows:

(a) On the claim under the consumer protection statutes of Massachusetts, compensatory damages, treble damages, punitive damages, and any other damages permitted under such statutes, such amounts to be determined at trial, plus Plaintiff's costs in this suit and reasonable attorneys' fees;

(b)    On the conspiracy/concert of action claim, compensatory damages, treble damages and punitive damages, such amounts to be determined at trial, plus Plaintiff's costs in this suit and all reasonable attorneys' fees;

(d)    On the claim for unjust enrichment, recovery in the amount of Plaintiff's and the Class's (i) payments for these Subject Drugs to treat conditions for which these drugs were not approved by the FDA; (ii) over-payments for these Subject Drugs resulting from Defendant-promoted treatment with excessive dosages or over excessive durations that were not FDA-approved, even if treating the underlying medical condition with these Subject Drugs was FDA-approved; and (iii) payments or over-payments for these Subject Drugs where Plaintiff's and the Class's purchases arose from bribes, kickbacks, illegal remuneration or other illegal inducements paid or provided to physicians by the Defendants, such amounts to be determined at trial, plus Plaintiff's costs in this suit and reasonable attorneys' fees;

(e)    Awarding Plaintiff and the Class other appropriate equitable relief, including, but not limited to, disgorgement of all profits obtained from their wrongful conduct and declaratory relief;

(f)    Awarding Plaintiff and the Class pre-judgment and post-judgment interest at the maximum rate allowed by law;

(g)    Awarding Plaintiff and the Class their costs and expenses in this litigation, including expert fees, and reasonable attorneys' fees; and

(h)    Awarding Plaintiff and the Class such other and further relief as may be just and proper under the circumstances.

54

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all

issues so triable.

Dated: July 12, 2007                         Respectfully submitted,


                                   By:  /s/ Kristin A. Suga_____
                                        Wm. Gerald McElroy, Jr., No. 332500
                                        Kristin A. Suga, No. 661482.
                                        Zelle, Hofmann, Voelbel, Mason & Gette LLP
                                        950 Winter Street, Suite 1300
                                        Waltham, MA  02451
                                        Phone:  (781) 466-0700
                                        Fax:  (781)-466-0701
                                        Email: wmcelroy@zelle.com
                                               ksuga@zelle.com

*Of Counsel:*

Richard M. Hagstrom
Michael E. Jacobs
James S. Reece
Aaron M. McParlan
Zelle, Hofmann, Voelbel, Mason & Gette LLP
500 Washington Avenue South
Suite 4000
Minneapolis, MN 55415
Phone: 612-339-2020
Fax:  612-336-9100
Email: rhagstrom@zelle.com
       mjacobs@zelle.com
       jreece@zelle.com
       amcparlan@zelle.com

       and

Russell A. Ingebritson
Ingebritson & Associates, P.A.
Medical Arts Building, Suite 1025
825 Nicollet Mall
Minneapolis, MN  55402
Phone: 612-340-8290
Fax: 612-342-2990
Email: russinge47@aol.com

and

Darrold E. Persson
Matonich & Persson, Chtd.
2031 Second Avenue East
Hibbing, MN 55746
Phone: 218-263-8881
Fax: 218-263-8161
Email: dpersson@matonichlaw.com

**ATTORNEYS FOR PLAINTIFF AND ALL OTHERS SIMILARLY SITUATED**